ORIGINAL

UNITED STATES DISTRICT COURT

DISTRICT OF GUAM

| | |
|---|---|
| J.C., a person with a disability, S.F., a person with a disability, and J.M., a person with a disability,<br><br>Plaintiffs,<br><br>v.<br><br>FELIX P. CAMACHO, in his official capacity as Governor of Guam,<br><br>ROSEANNE ADA, in her official capacity as Director of the Department of Integrated Services for Individuals with Disabilities, and<br><br>J. PETER ROBERTO, in his official capacity as Director of the Department of Mental Health and Substance Abuse,<br><br>Defendants. | No. CV 01-00041<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The matter before the Court, the Honorable Consuelo B. Marshall, District Judge, presiding, is the Court trial in this action for declaratory and injunctive relief in which Plaintiffs claim that Defendants, Felix P. Camacho, in his official capacity as Governor of Guam, Roseanne Ada, in her official capacity as Director of the Department of Integrated Services for Individuals with Disabilities ("DISID"), and J. Peter Roberto, in his official capacity as Director of the

Department of Mental Health and Substance Abuse ("DMHSA") have violated their rights guaranteed by the 14th Amendment of the United States Constitution, Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitiation Act of 1973. Plaintiffs' claims are based upon an alleged failure of Defendants to provide appropriate community-based living services to Plaintiffs.

Plaintiffs sought and obtained preliminary injunctive relief on November 6, 2001.

A Court trial was held before the Court on March 9, 10, and 11, 2004. Upon consideration of the testimony and documentary evidence received in this case, the Court's evaluation of the demeanor and credibility of the witnesses, and the Proposed Findings of Fact and Conclusions of Law submitted by the Parties, the Court issued findings on the record in the presence of the parties on March 16, 2004. The Court now makes the following supplemental findings:

## I. FINDINGS OF FACT

1. Defendant Felix P. Camacho is the Governor and Chief Executive Officer of Guam. Defendant Roseanne Ada is the Director of DISID, an agency of the Government of Guam which exists to ensure the provision of an array of appropriate services and care to individuals with disabilities, including the development and provision of service programs in the public or private sector for persons with disabilities; the establishment of a continuum of comprehensive services and residential alternatives in the community so as to allow individuals with disabilities to live in the least restrictive environment. Defendant J. Peter Roberto is the Director of DMHSA, an agency of the Government of Guam, pursuant to Guam statute, DMHSA provides services which include partial hospitalization and aftercare services to include transitional homes for the mentally ill, and inpatient services including, but not limited to, acute psychiatroc

and alocohol and drug detoxification services.

2. Plaintiff J.C. is an individual with a disability under the ADA. He is a forty-one year old male who has been diagnosed with mental retardation and psychosis NOS (not otherwise specified. He was first admitted to the Adult Inpatient Unit ("AIU") of the DMHSA on or about November 19, 1999 and discharged on December 6, 1999. Plaintiff J.C. was re-admitted to the AIU on September 19, 2000. Plaintiff J.C. currently resides at the AIU.

3. Plaintiff S.F. is an individual with a disability under the ADA. He is a seventy year old male who has been diagnosed as having dementia with behavioral disturbance and alcohol dependance. S.F. was first admitted to the AIU on July 10, 2000 on a sevety-two hour hold. On July 13, 2000, Plaintiff S.F. was re-admitted to the AIU. On August 5, 2001, Plaintiff S.F. was placed at Guma Hinemlo, a permanant supportive housing program operated by Guma Mami under contract by DMHSA, with funds provided through the Guam Housing and Urban Renewal Authority ("GHURA") Continuum of Care Housing and Urban Development ("HUD") program.

4. Plaintiff J.M. is an individual with a disability under the ADA. He is a twenty-five year old male who has been diagnosed with autism, bipolar disorder, and moderate mental retardation. J.M. was placed by the Department of Education ("DOE") in September 1987 at the Boston Higashi School because there was no facility or program on Guam appropriate to meet J.M.'s needs. He was returned to Guam in April 2000 because DOE was no longer obligated to provide for Plaintiff J.M.'s care. J.M. has been a client of DISID since July 19, 1999. He was admitted to the AIU on April 26, 2000 and since his admission, J.M. has resided continuously in a seclusion room at the AIU and J.M.'s meals and bed were and are provided by his family.

5. On one or more occassions, treating psychiatrists of J.C., S.F., and J.M., and

3

each of them, including, but not necessarily limited to Drs. Joan Gill, Claire Ashe, William Hoctor, have recommended that individual Plaintiffs J.C., S.F., and J.M. be placed in a community-based residential facility appropriate to their individual needs and circumstances. On one or more occasions, the treating psychiatrists of Plaintiffs J.C., S.F., and J.M., have stated that individual Plaintiffs J.C., S.F., and J.M. would benefit from receiving one or more of the following: occupational therapy, speech therapy, vocational therapy, recreational therapy, behavioral therapy, and brief passes home.

6. Neither Plaintiffs object to residing in a community-based residential treatment facility.

7. The AIU is a 24-hour locked facility with sixteen beds for patients. Residents of the AIU include Plaintiffs, individuals found not guilty of crimes by reason of mental defect, and other patients whose mental illness requires institutionalization.

8. According to Defendant Roberto, approximately $1.9 million is the personnel cost for the AIU staff for one year, consisting of staff nurses and technicians. The average staffing cost per bed is $118,750 (taking 1.9 million dollars and dividing it by the 16 patient beds), This amount does not include the psychiatrist(s) contract or other expenses related to the operations of the AIU.

9. According to Plaintiff J.C.'s DMHSA treatment records, Plaintiff J.C. has walked off the AIU, a locked ward, on two (2) occasions being returned to the AIU both times by the police; has been placed in two-point restraints and in a locked seclusion room for physical aggression, pounding on walls, and not responding to redirection; fell on the floor and lacerated his chin, with abrasions to his left leg, while in ambulatory restraints. Plaintiff J.C. received treatment some seven (7) hours later at the Guam Memorial Emergency Room, with five (5) stitches to his chin. Plaintiff J.C. has been bitten twice by other clients and has

4

1  been placed in locked seclusion on at least two (2) occasions without doctor's
2  orders. Plaintiff J.C. has been sexually abused by another male client.
3  10.    Plaintiffs' treating psychiatrists and Defendants Roberto and Ada,
4  expressed that the AIU is an inappropriate placement for Plaintiffs. In addition,
5  Plaintiffs' expert witnesses have expressed Plaintiffs J.C. and J.M. have
6  experienced and are at risk of further deterioration or regression as a result of
7  placement and/or continued placement at the AIU.
8  11.    Plaintiffs J.C. and J.M. receive little or no formal education or therapy at
9  the AIU. Expert witnesses testified on behalf of Plaintiffs that both J.C. and J.M.
10 would benefit from receiving one or more of the following: occupational therapy,
11 speech therapy, vocational therapy, recreational therapy, and brief passes home.
12 These services are not available to Plaintiffs at DMHSA's AIU.
13 12.    Plaintiffs' experts testified that the planning of treatment and
14 interventions for Plaintiffs while at the DMHSA substantially departs from the
15 generally accepted minimum standards of care. Plaintiffs' experts testified that
16 DMHSA does not recognize that adequate treatment requires and required that the
17 Defendants' conduct an initial "work up" of the Plaintiffs, formulate an accurate
18 diagnosis with input by all of the disciplines involved in the Plaintiffs treatment,
19 and develop an individualized plan to build on strengths, interests, preferences and
20 goals. Plaintiffs J.C. and J.M. case files contain documents entitled "case
21 summary" and "treatment plan." Plaintiffs' experts found these to bear no
22 resemblance to a comprehensive integrated plan for the provision of treatment
23 addressing the individual needs of the Plaintiffs. In fact, both provided the same
24 treatment: continued medication and placement outside of the AIU. No goals for
25 treatment other then those mentioned (medication and placement) were or
26 currently are in place for Plaintiffs. Plaintiffs' expert found DMHSA substantially
27 departed from the generally accepted minium standards of care by failing to
28

5

conduct: a) a complete medical evaluation to rule out or make conclusive findings regarding possible biological causes of Plaintiffs' psychological, behavioral, or cognitive difficulties; b) a psychiatric evaluation of Plaintiffs and, if indicated, a psychological evaluation of Plaintiffs; c) a developmental history of Plaintiffs; d) a comprehensive psycho-social history of Plaintiffs; e) an occupational therapy evaluation; f) a dietary needs/therapy evaluation; g) a recreational therapy evaluation; h) an Art and Music therapy evaluation; i) proper documentation of direct observation of the Plaintiffs; j) a treatment team consisting of, at a minimum, the treating psychiatrist, a nurse representative, a social worker, representatives from ancillary services and other agencies providing care or treatment to Plaintiffs on a weekly basis; and k) the development of a treatment plan within seventy-two (72) hours of initial placement in the AIU, to include, but not limited to, discharge planning and a behavioral plan as indicated.

13. Caridad II and the Mary Clare Home and Independent Group Home are programs operated by, or under contract with the Defendants, which provide, or are designed to provide and are mandated to provide community-based services that the Plaintiffs seek in the present lawsuit. Since the filing of the lawsuit, Defendants or non-profit organizations have obtained grants to expand community-based treatment services available to Plaintiffs. DMHSA, through federal funding and under contract for operations with Guma Mami, opened the Guma Hinemolo, a long-term care program for individuals with chronic mental illness. A second program, Guma Inayek, intended to provide community-based treatment services to individuals dually diagnosed with mental illness and mental retardation, like Plaintiffs J.C. and J.M, was funded through both federal and local funding to Guma Mami, a private non-profit. Unfortunately, due to a failure to timely secure facilities the program was not completed.

14. Guma Mami operates two (2) residential community-based treatment

facilities: the Independent Group Home ("IGH") and the Mary Clare Home. Each home may serve up to five (5) consumers. Guma Mami's residents receive public assistance for housing and utilities from Guam Housing and Urban Renewal Authority ("GHURA") and at least 75% of the homes' food costs are paid through other public funds. DISID contracted with Guma Mami for the placement of up to five (5) individuals in each home. DISID pays $270,000 for placement at IGH and $291,000 for the Mary Clare Home. The approximate cost of care per person for each home is $60,000 per annum. Both IGH and the Mary Clare Home are filled to capacity.

15. While Defendants have asserted undue financial hardship, Defendants presented no evidence that resources are not available. To the contrary, Defendants testified that funding was assured by Defendant, Governor Camacho, and from Guam's Health and Human legislative committee chairperson, Senator Lou Leon Guerrero. Additionally, Defendant Ada testified that money received by the Guam Department of Public Health and Social Services under the federal government's Real Choices grant in an amount exceeding $600,000 could be used for services for Plaintiffs. Finally, GHURA Planner Rebecca Borja, testified that funds available under the federal program for homelessness, continuum of care funding have been (and may be) accessed to provide services to persons similar to Plaintiffs and, in fact, funding was approved with a local match obtained to open a program focused on the needs of that of the Plaintiffs. Ms. Borja also testified that funding for program development is also available under community development block grants received by Guam and while DMHSA has accessed and received funding under both of these programs, DISID has never applied.

16. While Defendants have asserted that they have an effective working plan for placing qualified persons with mental disabilities in less restrictive settings and a wait list for those services that moves at a reasonable rate, Defendants' evidence

7

fails to sufficiently support these assertions. In fact the evidence presented to the Court was that Defendants policies regarding placement and receipt of services is still in the developmental stages.

17. The evidence presented by Defendants indicates that no one has been placed from the waiting list since the creation of DISID without court order and that the current purported waiting list is only a list of individuals requesting services and that no priorities have been assigned to any individual contained therein. Defendants themselves testify that all of the individuals who are currently in an inappropriate placement are in critical need of placement elsewhere. The Court finds that Defendants' purported waiting list is simply a list of persons not receiving services and an individual is only taken off the list when a court order requires the individual's placement elsewhere.

18. The Court finds that in this case Defendants have failed to take the action necessary to comply with this Court's Preliminary Injunction.

## II. CONCLUSIONS OF LAW

**A.  Americans with Disabilities Act and Rehabilitation Act**

1. The Americans with Disabilities Act ("ADA") was enacted by Congress to eliminate discrimination against persons with mental or physical disabilities. 42 U.S.C. § 12101 (b). Congress also determined that discrimination against individuals with disabilities persisted in such areas as health services and access to public services. 42 U.S.C. § 12101(a)(3).

2. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Defendants do not dispute that the Government of Guam is a "public entity" within the scope of the ADA nor do they dispute that Plaintiffs are qualified individuals with a disability.

8

3. Section 12132 constitutes a "general prohibition against discrimination by public agencies." *Bay Area Addiction Research & Treatment, Inc v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999). The U.S. Supreme Court has held that "undue institutionalization [of mentally disabled persons] qualifies as discrimination 'by reason .... disability." *Olmstead v. Zimring*, 527 U.S. 581, 597-98 (1999), The Court stated:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607.

4. Nothing in the ADA condones termination of institutional settings for persons unable to handle or benefit from community settings. Consistent with the ADA, the State may rely on the assessment of its own professional in determining whether an individual meets the essential eligibility requirements for habilitation in a community-based program. The individual must also desire placement in a community-based facility. *See Olmstead*, 527 U.S. at 602-03.

5. Regulations promulgated under Title II impose an affirmative duty on a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). However, the State is not required to "fundamentally alter' the nature of its services or programs." *Id.* The state may defend a failure to place individuals in appropriate community-based facilities on the basis that the Plaintiffs' requested modifications to the State's placement system constitute a "fundamental alteration of the States' services and programs."

9

*Id.* at 603, *citing* 28 C.F.R. § 35.130(b)(7). If a State "were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable modifications standard would be met." *Olmstead*, 527 U.S. at 605-06.

6. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794 prohibits discrimination on the basis of disability in federally assisted programs and activities, and may not, solely by reason of his or her disability exclude an individual from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance period. A program or activity means the operations of a department, agency, special purpose district, or other instrumentality of a state or of a local government, including each entity that distributes such assistance.

7. The operations of the Defendants are federally assisted programs and activities covered by Section 504 of the Rehabilitation Act of 1973. The standards used in determining whether Section 504 of the Rehabilitation Act of 1973 has been violated are the same standards applied under Title II of the ADA.

8. The parties do not dispute that the Guam DISID and DMHSA are public entities and that plaintiffs are individual with disabilities for ADA and Section 504 purposes. The parties do not dispute that the Guam treatment professionals have determined that community-based treatment is appropriate for Plaintiffs; and Plaintiffs do not oppose community-based treatment. Therefore, the focus of the Court's analysis of Plaintiffs' request under *Olmstead* is whether the placement of Plaintiffs can be reasonable accommodated, taking into account the resources available to Guam and the needs of others with mental disabilities. *Id.* at 607.

9. Defendants testimony supports that Plaintiffs can reasonably be provided

community-based treatment with resources currently available to Guam, or which may be applied for through federal funding sources.

10. Defendants have failed to show that Plaintiffs' placement in a community-based treatment center would fundamentally alter Guam's provision of services to persons with mental impairments. Guam provides services to individuals similar to Plaintiffs both on Guam and off island and current plans are underway to expand on-island services for dual diagnosis individuals similar to Plaintiffs.

11. Defendants have failed to show that they have an *effective* working plan in place for placement of Plaintiffs, and other individuals inappropriately placed in the AIU, pursuant to *Olmstead*. Defendants have not demonstrated that there is a waiting list which moves at a reasonable pace and have not demonstrated sufficient efforts for placement of qualified persons with mental disabilities in less restrictive settings.

12. The Defendants provide an array of services to individuals with mental disabilities. DISID, in particular, provides services to individuals with both physical and mental disabilities. All the Defendants are mandated to provide services to persons with disabilities according to their particular needs. Nonetheless, the Defendants have discriminated against the Plaintiffs by requiring them to reside in the locked unit of the AIU in order to receive services. Furthermore, the services provided to the Plaintiffs are not appropriate to their particular needs.

13. Because, as is evidenced in the present case, the Defendants have failed to comply with the Court's Preliminary Injunction, the Court finds that there exists special circumstances requiring the appointment of a special master to insure compliance with the Court's orders herein. The Court's orders herein will require monitoring for compliance, and the Court finds that there is a requirement that the Defendants, not only place the Plaintiffs in appropriate community-based

residential facilities, but also that the Defendant develop a plan to insure non-discriminatory services to the Plaintiffs. Defendants' violations with respect to Plaintiffs are capable of repetition until or unless a plan is developed according to *Olmstead* that is an effective working plan with waiting lists for community based placements, that move at a reasonable rate.

B. <u>Due Process Requirements of the Fourteenth Amendment</u>

14. An individual's constitutionally protected liberty interests require the State to provide "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *See Youngberg v. Romeo*, 457 U.S. 307, 319-323 (1982).

15. Residents of state-operated facilities have a right to live in reasonable safety, to receive adequate health care, along with habilitation to ensure their safety and freedom from unreasonable restraint, prevention regression, and facilitate their ability to exercise their liberty interests. *Id.*

16. Plaintiffs have the constitutional right to minimally adequate habilitation in a setting designed to reduce self-abuse and aggression. That means habilitation which will *tend* to render unnecessary the use of chemical restraint, shackles, solitary confinement, locked wards, or prolonged isolation from one's normal community; and conditions of life which are normal enough to promote rather than detract from one's chances of living with fewer restrictions on one's movement.

17. Plaintiffs also have a constitutional right to habilitation which is minimally adequate to *maintain* basic self-care skills. In a concurring opinion in *Youngberg*, Justice Blackmun, joined by Justices Brennan and O'Connor, argued that minimally adequate training includes "such training as is reasonably necessary to prevent a person's pre-existing self-care skills from deteriorating...." 457 U.S. at 327.

18. Plaintiffs have established that their constitutional rights under *Youngberg* have been violated by the Defendants. Specifically, the court concludes that:

    a. The Defendants has failed to provide reasonably safe conditions of confinement for Plaintiffs committed to the state psychiatric hospitals.

    b. The Plaintiffs have been subjected to unreasonable bodily restraints.

    c. The Defendants have failed to provide the Plaintiffs with minimally adequate habilitation that is reasonable in light of the circumstances of this case.

    d. The Defendants have consistently failed to implement the recommendations of the State's treating professionals.

    e. The Defendants' decision to place mentally retarded persons on general psychiatric wards and to seclude and mechanically restrain the Plaintiffs without employing behavioral treatment programs is such a substantial departure from accepted professional judgment, practice and standards as to demonstrate that the decision is not a function of independent professional judgment within the meaning of *Youngberg*.

    f. The Defendants' failure to fulfill the community placement recommendations of the state's treating professionals is such a substantial departure from accepted professional judgment, practice and standards as to demonstrate that the decision is not a function of independent professional judgment within the meaning of *Youngberg*.

13

Case 1:01-cv-00041   Document 276   Filed 06/08/04   Page 13 of 14

g. The Defendants have failed to provide the training necessary to insure the Plaintiffs' safety and to facilitate their ability to function free from bodily restraints.

IT IS SO ORDERED.

DATE: June 7, 2004



**CONSUELO B. MARSHALL**
**UNITED STATES DISTRICT JUDGE**

Notice is hereby given that this document was entered on the docket on 06/08/04.
No separate notice of entry on the docket will be issued by this Court.
Mary L. M. Moran
Clerk, District Court of Guam
By: [signature] 06/08/04
Deputy Clerk    Date